We'll call the next case, please. 314-0064, Mr. Burke Engineering, appellant by Jeffrey Crump, the Heritage Bank of Central Illinois appellee by Michael Crabb. Mr. Crump. Good morning, Your Honors. My name is Jeff Crump and I have the appellant in this case. As the Court is aware, this is a mechanics lien proceeding coming out of Peoria County. I represent an engineering firm that performed the engineering work necessary to develop a residential subdivision in Bartonville, Illinois. There are two issues, as I see it, that we have raised on appeal that I believe the trial court erred on. One, it deals with whether it's necessary to actually show that you've made some type of physical improvement on a piece of property in order to be entitled to a lien. And two, whether or not we successfully demonstrated that the knowingly permitted standard under Section 1 of the Act was met. The Court ruled against us on both those points and found that, pursuant to granting of the bank's motion for summary judgment, that the lien claimant had not shown that there was any improvement to the land based on my client's work, and that, in the Court's words, there was no encouragement or inducement by the land owner for the work that was performed. This is a case where the claimant did not contract directly with the property owner. The claimant, the engineer, contracted with someone who was buying the property. And therefore, we proceeded on the knowingly permitted standard under the statute. What evidence is there that Schenck authorized a knowingly permitted Harkins to contract? Well, Judge, on the knowingly permitted part of the equation, I quote from Ms. Schenck's deposition in my brief and from Mr. Harkin's deposition in my brief, where Ms. Schenck said, I knew that Harkins had hired somebody to do some engineering work. I may or may not have been told who they were. I didn't know exactly what they were doing, but I did not object to that because, of course, she wanted the initial exploratory and platting work to be done. Harkins testified, I may or may not have told her who Burke was, but she knew that we were performing engineering work at the property and we had a verbal understanding that that was okay for me to do. When she was asked repeatedly, did you have any objection to either the firm or the work that was being performed, she said no. Under my reading of the cases, which is contrary to counsel for the bank's reading of the cases, the knowingly permitted standard is quite liberal. It is if the owner knew that some work was being done and didn't object, that's knowingly permitted. That meets the standard. There are a lot of landlords. There are no cases that say that. You know, in this kind of context, with this kind of chain of events. Well, Judge, I think there are quite a few cases that say that if a property owner is aware of work being performed on their property and they do not object, that meets the standard. And those cases are like with carpenters and plumbers. There's a whole variety of work done on a house or things like that, correct? That's correct, Judge. There's no middleman. Well, by middleman there's...  Oh, actually, Judge, I think there's quite a few cases like that. The Construx case, for instance, comes to mind. Construx v. Kazerman was a case where it was a commercial property, a tavern, that was being sold on contract. The tenant, who was the middle person, if you will, Your Honor, contracted to have some work done without the owner's knowledge. And it was work at the rear of the building, like a staircase or something like that. The work proceeded to conclusion and there was some evidence at trial, Your Honor, that the owner might have driven by the area once and seen the work in process and didn't object. The court said that's good enough. The owner testified, no, I was never told about the work that was being done in the back of the building and I didn't see it. So in that case, I think that's pushing the envelope to the absolute edge where you have a pretty serious conflict about what the owner was even told or what the owner knew. In our case, there's no dispute what the owner knew. She knew the work was being done. She didn't object to it. She approved of it. She knew that the engineering work was being performed. There are no requirements that anything more than that has to be shown. In fact, in Armco Steel v. LaSalle, which I think I cite in my brief, the court says, we believe that the words knowingly permit in the statute are to be taken in their general sense of being aware of the work and consenting to the improvements, that is, the initiation of the improvements. In other words, if you are aware that things have started and you do not object, you're on the hook. There are landlord-tenant cases to that effect as well, even in instances where a lease prohibits the improvements and specifically bans the tenant from making the improvements and requires the tenant to seek written permission before improvements are made. Even in that type of case, if the tenant goes ahead and contracts, the tenant middle party goes out and contracts and work gets done and the landlord walks by the front of the building and says, hey, what's going on here? And the tenant says, I'm fixing the cornices or I'm putting new windows in. And the landlord shrugs his shoulders and walks away and doesn't object. That's knowingly permitted. So that, I believe, is the law. I do not believe there's any case law that requires the owner to induce the transaction. And quite honestly, there are many, many, many, many cases where the owner doesn't do anything. And in this case, Ms. Shank did nothing to induce that other than enter into a contract, I suppose, for sale that allowed those preliminary studies to be done. I mean, she anticipated that that would happen. And in fact, it did happen, but she didn't say, I want you to go out and hire an engineer. So I think the trial court expanded the requirements of what's necessary to show the knowingly permitted standard beyond the boundaries of what the statute requires and way beyond the boundaries of what the cases have held. What's even clearer, in my opinion, than that is the error in the conclusion that you have to show some type of physical improvement on a piece of property in order to be able to show that. That's wrong. And in my opinion, and what I tried to express in the court below, is Section 1B of the statute talks about what it means to improve a property. Well, what was the whole extent of what Hawkins, with the engineering firm, what Burke precisely did for Hawkins under the contract, the whole scope of it? The scope of it was essentially judged to design plats, draw up the plats, get the final plats approved for the subdivision itself, lay out the subdivision, where the lots and the houses. This was just a big 20 or 30. And that was for Hawkins? That's correct. That's what Hawkins contracted for him to do. And then that evolved into other things like a wetlands delineation study and some other things that were required to get the project up and going. And in fact, one house was built on the property, one lot, and that was it. And then the owner experienced some financial problems. The market went dry and the project did not proceed and the owner ultimately went bankrupt. So it was a pretty classic set of engagement for what the engineering work was necessary to make the subdivision buildable. The rather strange aspect to the trial court's holding about improvement and that we had to show some actual physical, somebody swung a hammer on the property and built something, was somebody actually did swing a hammer on the property and built something. Lot 37. Were you settled separately with those people? Yes, Judge. Those people were defendants in the case and they settled up after the first appeal in this case. So not only was there physical improvement to the property... Actually, I don't understand how you could use that fact, you know, those are the Allison's? The Allison's, right. How did you use the Allison's fact to get the bank on hook? Well, the Allison's aren't necessary, Judge, to show that my client furnished labor materials or services to the property. The Allison's are just my point that in fact labor material and services physically were furnished to a portion of the property, but even more fundamentally than that, my point is that's not necessary. And that's where the trial court and I and counsel for the bank have a disagreement. The statute says that if you are an architect, structural engineer or a professional engineer or a land surveyor or a property manager, you have a lien for the performance of any services or the occurrence of any expense related to Section 1 of the statute. The Rinaldi case that I cite in my brief and that I cited below talks about how over time it used to be just architects. Because architects don't swing hammers, they draw drawings and design buildings. They used to not be able to glean real estate based on that. Over time that was changed. Architects were added and said if you provide a service, you draw a building, you have a lien. That was expanded to include engineers, surveyors and other people that I just read over time. Does the building have to be constructed? Do plans have to be utilized for that lien to exist? I think there are some cases that say that, Judge, with respect to architects. Are there any cases with respect to architects that say just drawing up a blueprint, I assume that's what they do. Drawing up a blueprint does entitle that person to a lien against the property where the building was intended to be constructed. I think there is one case that says that as well. However, I don't have that in front of me. Rinaldi talks about how... There are cases that deal with engineering work. Designing a subdivision type work. Not specifically that I'm aware of, Judge. But that's mostly what engineers in this type of situation would be doing. And Rinaldi says you don't have to show that there was labor and material furnished to the real property at all. It says the service that you performed as a professional engineer or an architect is enough. Thank you, Judge. I think we have a couple fundamental disagreements, I do, with the trial court in that I believe the trial court imposed an obligation on us that's not fair to show physical improvement to property in order to be entitled to a lien. And I believe the trial court expanded and went beyond what the case law requires to show knowing permission. The cases that counsel cites and that the court relies on, there's two of them, L.J. Keefe and Moe Stardy, I believe, are cases that don't even involve... The primary discussion is not with respect to knowingly permitted anyway. Those are cases that are involved within an analysis of what is a lienable service to begin with. So those cases are not particularly germane to the analysis or the facts that we have in this instance anyway. So if there are no other questions, I will sit down and respond if there is rebuttal time. Thank you, Judge. May it please the Court. My name is Mike Kraft and I represent the defendant, Apple Lee, Heritage Bank of Central Illinois. And we request that this Court affirm the summary judgment order that was entered on behalf of the Heritage Bank in this case. For the reasons that the Court properly determined that the owner of the property did not knowingly permit to contract with the property. We request that this Court affirm the summary judgment order that was entered on behalf of the Heritage Bank in this case. The Mechanics Lien Act states that a contractor can have a lien if the contractor directly contracts with the owner. That's not the case here, as admitted in the complaint. Or if the contractor contracts with somebody that's authorized, like an agent of the owner. And that's not the case here. That's not contended by Mr. Crumpy and his client. And then the third is knowingly permitted. And that's the sole issue in front of the Court on this appeal. And I think that Mr. Crumpy mischaracterizes that test, the knowingly permitted test. And doesn't address the case that we cite, the Fettus Love case. States that the Fettus Love case states that in order for a contractor to have contracted with somebody the owner knowingly permitted to contract, there has to be three factors. One is knowledge of the contract and the work. That's one. Second is a failure to protest to the work being done. And the third is an acceptance of the benefits of the improvement to the property. So all three of those fall under the knowingly permitted test. Those are all factors for that. And I think Mr. Crumpy is trying to separate those two. And that's important in this case because all three of them have to be proven in order for a lien to arise under the McKinsey Act. And it's clear that none of those have been proven in this case. In the reply brief, Mr. Crumpy raises the issue of waiver. And the waiver is based solely upon the knowledge that my client, a third-party incumbencer, had. And nowhere in the McKinsey statute, in those three ways that a lien can arise, does the issue of a third-party incumbencer's knowledge come up. And the case law states that in order for a lien to arise, you have to strictly construe the McKinsey Act. Well, he cites a case where there was a drive-by. You know, I saw some work done. And also there's the fact that there was testimony that, well, we knew that they were doing something, right? And there was no protest. Well, there was, as far as the knowledge issue... They knew something was being done, so no protest about it. The only thing... The only quote that Ms. Shank stated in her deposition was she replied yes to a question in which Mr. Crumpy fed language to her. And it stated that, well, you knew that there was some plat work done. And you knew PERC engineering. And she said yes. Every other question that was asked about that, she said that she did not have knowledge. And there's statements of fact that we provided with our summary judgment, extensive statements of fact, which are all supported by the deposition testimony and documents of the case, and were not refuted at all at the trial court level, and have not been refuted at all in the briefs. And those state that the owner had no knowledge of any work done by plaintiff. No knowledge of any work. So the issue is, in the brief there, Mr. Crumpy raises the issue of we're trying to state that there has to be a high level of detail, of knowledge of what work was done. But what we're saying is that she had no knowledge of any detail. She had no knowledge of any detail of what the work was being done. The knowledge that she may have had was that PERC engineering existed, and that they may have been contacted. And the reason that they were contacted in this case is for due diligence purposes, just like the cases that we've cited in our brief. And that is... Can it be done off-site without ever going to the property? Can it be done? It was done. Off-site without ever going to the property. Based on aerial photographs or something like that. Right. And there's no evidence in the record. In fact, the evidence in the statement of facts is that the person from PERC engineering that was involved never contacted Ms. Skank, the owner. Was never present on the property. Right. And so one of the three factors is you have to protest the work being done. Well, how can you protest? First of all, she didn't have knowledge of any details of what the work was to protest. And secondly, the work was done in an office. And how could she have protested that? And that raises the issue of the hypothetical in the brief that we raised. If five different potential suitors for the property all did the same thing, all due diligence work. Work that needs to be done in order for a potential buyer to determine whether they want to buy the property. Whether or not a bank wants to lend money to that party. It's all due diligence work. It doesn't improve the property at all. That's necessary even to move forward on that. And if all five of those did that, they weren't paid by the contractor that contracted them. And nobody bought it. Potentially, the owner of the property would be stuck with five mechanics liens if the arguments of the appellant had any merit in this case. And that's certainly not the case. What's your argument on the third element? The improvement? Again, undisputed facts, statement of facts. And that is that Ms. Skank stated that she never received any benefit. Mr. Harkins stated in his deposition that Ms. Skank was never intended to receive any benefit and didn't receive any benefit. But again, that work was done only for purposes of determining, as admitted by Mr. Harkins, determining whether or not Ms. Skank was going to buy the property. It wasn't a benefit to her because it could have come back and said that no, it's not feasible because for whatever reason it can't be subdivided into enough lots. So the work determined that it wasn't feasible to purchase it. So in that circumstance, that could not have helped the landowner. What about in this case? What happened in this case? The plotting work, the due diligence work, had absolutely no benefit to the landowner in this case. If the landowner had initiated it to convince the buyer to buy, then it would have benefited her. But she didn't initiate it. The buyer initiated it to make sure it was an intelligent purchase. It was not a precipitating factor for her to sell, only for the buyer to buy. And that's a great point. I think the case law says that the courts are looking to maybe impose the lien on the landowner if the landowner... that it was induced by the landowner in this case at all. And it's important that no benefit was actually received. Did she ever market the property as potential for subdivision or subdividing? Was it marketed that way? I do not know that, Your Honor. I don't think that the record has any information on that. As far as the improvement issue, there's three cases that have been cited that... the difference between our opinion as to what's required for a lien. And there not only has to be an improvement, but the improvement has to actually benefit the landowner. And the Orenstein case and the Mustardew Platt case are two cases in which there was kind of this due diligence work done. The Orenstein case was an architect that did some drawings and sketches for a hotel apartment in Chicago... for a party that did not out in at the time, but then subsequently did purchase it. And the court stated that was not lienable work. It was work that was done to determine what the possibilities were for the development of the property, just like what was done here. What's the possibilities for development? The Mustardew Platt case was work that was done for property. They wanted to build a coal gasification facility. And they needed to license it and get the permits before they agreed to purchase it because they had an option to purchase it. Again, the court stated that it was due diligence work to determine whether or not they wanted to purchase it. And the third case, the L.J. Keith case, is very important because it's actually a case where... a third party obtained a license from a railroad company to put in power transmission lines underground along the railroad easement. Commonwealth Edison, so they could serve their customers electricity. The third party, Commonwealth Edison, was actually making money off of the improvements that they made. They physically put transmission lines into the ground. And the company that did work for Commonwealth Edison wasn't paid, and they filed a lien claim against the owner. And the court said that it's not lienable work because there was no benefit to the landowner. The landowner got no benefit. There was no evidence that the land increased with that work, even though the lien claimant stated that, well, certainly Commonwealth Edison is charging for the transmission of electricity underground and making money, and presumably some of that money then goes to the owner. And the court still said, no, that's not an improvement that benefited the landowner, and it's not lienable work. So that's a case where there actually was physical improvement on the property, and the court still said that it wasn't lienable work because, again, it wasn't induced by the landowner, and there was no direct benefit. And that's really the key difference in our arguments here is that there has to be a direct benefit to the landowner in this case that was induced by the landowner, and that's not the case here. It's clearly the record's safe that that's not the case. Mr. Crumpy states a Rinaldi case, which I'm not familiar with. I'm not sure if it's quoted or cited differently, but I did not see that in the briefs, so I can't address that. I think he has misquoted the lien act itself as far as the definition of improve, which I've referenced in the brief, and he parcels the first part of the lien act in Section 1B, and he disregards two or three semi-colons and then brings in language at the end and tries to bring them together, and that's just not the case. The language regarding what is an improvement or definition of improve regarding an architect relates solely to a house being elevated or raised or removed. It does not go back to the language before that. Can you speak to the point that one lot was actually occupied for purposes of a home, and I presume within the plan as plotted out by the engineering group? It was, Your Honor. Is that a partial completion enough to fall within the improvement? No, Your Honor. That was done well after the closing. The landowner, Ms. Gink, had already closed and sold the property and had nothing to do with the sale of that lot, which was done wholly by the Harkins to the Allisons. So that was a benefit at the time to the Harkins, wasn't it? Solely to the Harkins. Did the engineering firm leave anything behind? And that goes to the statements that Mr. Harkins made in his deposition. He stated that there was no physical improvement, no increase in value. Nothing was left behind. It was in the same condition as it was before this all started. It was a vacant lot. Nothing was there improved. And again, he stated that he did the work only to determine if he should purchase the real estate. It was all due diligence work. So the work that was done was solely for the benefit. Wasn't that contemplated in the statute when it made specific reference to the engineer? I mean, frankly, before bringing this case, it was very frightening to me. I didn't realize it was covered by mechanic's claims at all. But after reading that, and after reading the statute, obviously they are, and there must be a purpose to it, right? And it's not hammering a nail on a board or installing electrical equipment. I mean, it has its purpose, and its purpose must be something like what happened here. I don't know what else they would be doing. And maybe you can help me out. Are there other things that would fit under the statute that this doesn't? Well, I don't think it's the issue of an architect, and specifically the architect. It could be any profession, necessarily. The issue is what knowledge... We're arguing that the architect wouldn't be covered under certain circumstances under the McHensley Act. We're stating that the circumstances that apply to all professions are not met here. There wasn't the requisite knowledge, and there was no direct benefit that was accepted by the landowner in this case. For those reasons, we request that the summary judgment be affirmed. Thank you. Any response? Anybody? Very briefly, Your Honor, and I'll respond to any questions and stop talking if you want me to. Mr. Kraft wants the court to believe that somehow there are these three or four different steps required by this Fetz-Sebin-Love case, when in fact Fetz-Sebin-Love, or whatever the name of the case is, cites two cases. It's an old case. It's never been cited for anything. It relies on a couple cases for this acceptance idea that don't say that, that don't impose that requirement. There is no separate, affirmative, definitive act that you have to say, I now accept these improvements. There's 10, 20, 30 cases that stand for the contrary that I discussed before, where a landlord, tenant, property owner, in whatever capacity, just walks by and sees something being done and doesn't do anything. So to suggest that somehow there are more stringent requirements is not consistent with the case law. To suggest that the record reflects that what my client was doing was due diligence work only, or whatever the language counsel used, is completely unsupported by the record. Mr. Harkins was asked about 40 times in his deposition by Mr. Kraft, well, if the engineering work had shown you could only build X number of homes on this property, you wouldn't have bought it, would you? And he repeatedly said yes. And so it wasn't like Mostardi, the case that Mr. Kraft discusses where they did environmental assessment studies, and property wasn't purchased. This is the work that was necessary to make the subdivision, to sell anything. The streets, the curbs, the gutters, the infrastructure, everything that's necessary to build a subdivision in a suburban environment, that's what my client did. To suggest that they never left the office and were never on the property is not supported by the record. They performed a wetlands delineation study on the property. They had to mark out where the wetlands lied and what was going to be done to satisfy. I think there was testimony in somebody's deposition, Ms. Rowe perhaps, about when a wetlands consumes a certain parcel of real estate, you have to account for that in other areas of the subdivision. If you can't build houses here, you have to provide for some additional lots somewhere else. So to suggest they sat in some office somewhere and did nothing but look at a computer is wrong, and it's not supported by the record. They were physically on the property. Carol Skank testified repeatedly in her deposition, and I've quoted it in my brief. Yeah, I knew they were there. I did not object. I knew Harkins was hiring engineers. I didn't know the details of their contract. Mr. Kraft would like the court to conclude that because she didn't know what the unit charges were for particular work that was being done, that she didn't know anything. That's not what the case law says. The case law doesn't require the owner to know anything about the particular contractual duties between the one knowingly permitted and the contractor performing the work. Unless there are any questions. You had earlier referred to a case called Rinaldi. Yes, Judge. I think counsel might be right. Rinaldi is probably not in the brief, but it's in the materials cited to the trial court, but the citation is 262. Can you give that to Mr. Kraft? And Mr. Kraft, you'll have seven days then to respond to the Rinaldi case. Thank you, Judge. Do you want me to give you the citation? It's 262 Illap 3rd, 179, 2nd District, 1994, 1st Bank of Roscoe v. Rinaldi, which stands for the proposition. It does discuss Section 1B and the architects, engineers and surveyors and other groups of individuals who don't have to physically improve property at all in order to be entitled to a lien. Thank you, Mr. Kraft. After the engineering study is done with the wetland study and the subdivision plans, who gets copies? Who can use it? Well, Judge, the wetland study itself, I'm not sure. I would anticipate that that would be Harkins. But that does raise a good point, at least in my mind. For instance, the preliminary and final plats that were recorded and are part of the record, that's a benefit to anyone. And it may be a benefit to the bank who may own this property at the conclusion of the case. So that was worth its public record of public knowledge. The wetland study and those items that were done in order to obtain the proper permitting and whatnot probably only went to the owner. Thank you. Thank you, Your Honor. Yes, Your Honor. All right. Well, thank you both very much for your argument today. We will take this matter under advisement and get back to you with a written disposition within a short time. We're now taking a short recess.